# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: August 15, 2012

Docket No. 31,167

ARCHIBALD A. SPROUL and
LISA McFADDEN SPROUL,

     Plaintiffs,

v.

ROB & CHARLIES, INC., GT BICYCLES,
INC., PACIFIC CYCLE, INC., and ISHIWATA,

     Defendants,

and

ROB & CHARLIES, INC.,

     Third-Party Plaintiff-Appellant,

v.

JOY INDUSTRIAL CO., LTD.,

     Third-Party Defendant-Appellee,

and

J & B IMPORTS, INC., QUALITY BICYCLE
PRODUCTS, INC., and DOREL INDUSTRIES, INC.,

     Third-Party Defendants.

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Barbara J. Vigil, District Judge

Hatcher & Tebo, P.A.
Scott P. Hatcher

Christopher J. Tebo
Santa Fe, NM

for Appellant

McClaugherty & Silver, P.C.
Tamara R. Safarik
Joe L. McClaugherty
Santa Fe, NM

for Appellee

**OPINION**

**VANZI, Judge.**

**{1}** This case arises from an indemnification claim brought by Third-Party Plaintiff Rob and Charlies, Inc. (R&C), a bicycle retailer doing business in New Mexico, against Third-Party Defendant Joy Industrial Co., Ltd. (Joy Co.), a foreign manufacturer of bicycle parts. R&C appeals a judgment of the district court granting Joy Co.'s motion to dismiss for lack of personal jurisdiction. The district court concluded that Joy Co. lacked the constitutionally required minimum contacts with New Mexico necessary to support personal jurisdiction and that, even if the necessary minimum contacts were established, the exercise of jurisdiction over Joy Co. would nevertheless offend traditional notions of fair play and substantial justice. We disagree with the district court and reverse. Further, this Opinion clarifies the standards to be used for evaluating whether a person or entity is subject to the jurisdiction of New Mexico courts despite not having been present in the state, either at the time of the suit or at the time of the alleged injury, and despite not having consented to the exercise of jurisdiction.

## I.    BACKGROUND

**{2}** In 1988, Plaintiff Archibald Sproul purchased a GT All-Terra Mountain Bicycle from R&C, a retail bicycle store located in Santa Fe, New Mexico. Sproul was riding that bicycle on May 19, 2003, at a BMX course in Santa Fe County. As he went over a bump, the front wheel separated from the bicycle's front fork assembly. Sproul was thrown off the bicycle and, as a result, he suffered serious, permanent injuries. On May 18, 2006, Sproul filed suit against R&C; GT Bicycles, Inc.; Pacific Cycle, Inc. (the companies that manufactured the bicycle); and Ishiwata (the company that manufactured the bike's frame and fork). Sproul alleged that, among other things, Defendants' negligently designed, manufactured, assembled, and sold the bicycle, quick-release hub, and front fork, which failed, causing the front wheel to fall off.

2

**{3}**     R&C filed a third-party complaint for indemnity against Joy Co. in May 2008. Joy Co. is the manufacturer of the quick-release mechanism on the GT bicycle that Sproul purchased from R&C. Joy Co. has its principal places of business in China and Taiwan, and its two manufacturing facilities are located in China. Joy Co. "sells its products to the global bicycle marketplace through a network of agents and suppliers."

**{4}**     R&C claimed that it was entitled to a right of indemnification against Joy Co. because Joy Co. was the upstream manufacturer of the allegedly defective quick-release mechanism that was ultimately sold by R&C in New Mexico. Joy Co. responded by filing a motion to dismiss for lack of personal jurisdiction. Joy Co. contended that it had no distributors or clients in New Mexico and did not know where the bicycles that incorporated its quick-release mechanisms were sold. Therefore, Joy Co. argued, there were no facts indicating that it had the necessary systematic and continuous contacts or purposeful contact required to subject it to either general or specific jurisdiction in New Mexico.

**{5}**     After allowing the parties to conduct limited discovery on the jurisdictional issue, the district court considered their written submissions and oral arguments and ultimately granted Joy Co.'s motion to dismiss. Specifically, the court concluded that R&C failed to show as a matter of law that Joy Co. had sufficient contacts with New Mexico to enable it to assert personal jurisdiction. The district court further found that the exercise of jurisdiction over Joy Co. would offend traditional notions of fair play and substantial justice. The district court denied R&C's motion for reconsideration; however, it certified the matter for interlocutory appeal, and we granted the application.

## II.     STANDARD OF REVIEW

**{6}**     The determination whether a district court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *Sublett v. Wallin*, 2004-NMCA-089, ¶ 11, 136 N.M. 102, 94 P.3d 845. Where, as here, the district court bases its ruling on the parties' pleadings, attachments, and non-evidentiary hearings, we apply a standard of review mirroring that of our standard governing appeals from summary judgment. *Id.* "We construe the pleadings and affidavits in the light most favorable to the complainant, and the complainant need only make a prima facie showing that personal jurisdiction exists." *Id.*; *see Tercero v. Roman Catholic Diocese*, 2002-NMSC-018, ¶ 5, 132 N.M. 312, 48 P.3d 50. Accordingly, dismissal is proper in this case only if all the specific facts that R&C alleges collectively fail to state a prima facie case for jurisdiction over Joy Co.

## III.     ANALYSIS

**{7}**     R&C raises eight issues on appeal. All of these issues can fairly be collapsed into one question: whether Joy Co. has sufficient minimum contacts with New Mexico necessary to support personal jurisdiction and, thus, whether the district court erred by granting Joy Co.'s motion to dismiss. The answer requires us to employ a two-step analysis. The first

step is to determine whether personal jurisdiction over Joy Co. would be in accordance with the requirements of New Mexico's long-arm statute. Concluding that jurisdiction may properly be extended under our long-arm statute, we then proceed to the second step. At step two of the analysis, we examine whether the exercise of personal jurisdiction would offend the Due Process Clause of the United States Constitution. Whether a state may exercise personal jurisdiction over a nonresident civil defendant depends on the nature and quality of the defendant's contacts with the forum. In that regard, personal jurisdiction has been described as being either "general" or "specific." R&C contends that both exist in this case. In addressing R&C's respective arguments, we determine that the state may not exercise general jurisdiction over Joy Co. However, in clarifying our personal jurisdiction jurisprudence—especially with respect to the stream of commerce theory of jurisdiction—Joy Co. has minimum sufficient contacts to subject it to specific jurisdiction in New Mexico under the standard set forth in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). Further, the volume of contacts Joy Co. has with New Mexico make it reasonable to subject Joy Co. to personal jurisdiction. This Opinion ends by analyzing the United States Supreme Court's opinion in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987), and its more recent decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, ___ U.S. ___, 131 S. Ct. 2780 (2011), and it addresses why personal jurisdiction cases are not evaluated under any of the competing versions of the stream of commerce theories in those cases.

## A.    New Mexico's Long-Arm Statute

{8}    In construing whether a nonresident defendant may be subject to jurisdiction in the forum state, this Court looks to New Mexico's long-arm statute, which provides, in pertinent part,

> Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts enumerated in this subsection thereby submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from:
>
> > (1)    the transaction of any business within this state;
> > . . . .
> > (3)    the commission of a tortious act within this state[.]

NMSA 1978, § 38-1-16(A)(1), (3) (1971). The term "person" as used in the statute includes corporations. *See, e.g.*, *Roberts v. Piper Aircraft Corp.*, 100 N.M. 363, 367-68, 670 P.2d 974, 978-79 (Ct. App. 1983) (holding that under our long-arm statute, New Mexico could assert personal jurisdiction over an Oklahoma service provider who advertised nationally and directly served a New Mexican customer). New Mexico courts do not require a technical determination whether a defendant has committed one of the enumerated acts. *Zavala v. El Paso Cnty. Hosp. Dist.*, 2007-NMCA-149, ¶ 10, 143 N.M. 36, 172 P.3d 173. Instead, because we "have construed the state long-arm statute as being coextensive with the

4

requirements of due process, [our] analysis collapses into a single search for the outer limits of what due process permits." *F.D.I.C. v. Hiatt*, 117 N.M. 461, 463, 872 P.2d 879, 881 (1994) (internal quotation marks and citation omitted). The question of personal jurisdiction therefore hinges on federal law.

## B.     The Due Process Clause

**{9}**     "The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant." *World-Wide Volkswagen*, 444 U.S. at 291. Due process is satisfied only when a defendant has sufficient minimum contacts with the forum state so that the assertion of jurisdiction over the defendant will not violate "traditional notions of fair play and substantial justice." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, ___ U.S. ___, ___, 131 S. Ct. 2846, 2853 (2011) (internal quotation marks and citation omitted); *Tercero*, 2002-NMSC-018, ¶ 7. Accordingly, we must first determine whether a defendant has sufficient minimum contacts with New Mexico. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) ("[T]he constitutional touchstone remains whether the defendant purposefully established minimum contacts in the forum [s]tate." (internal quotation marks and citation omitted)). If a defendant has sufficient minimum contacts for personal jurisdiction, such jurisdiction will be exercised only if it is reasonable to do so. *Zavala*, 2007-NMCA-149, ¶ 12 (setting out the five factors we consider to make this determination). Further, as we have noted, the minimum contacts required for the state to assert personal jurisdiction over a defendant depends on whether the jurisdiction asserted is general (all-purpose) or specific (case-linked). *Goodyear*, ___ U.S. at ___, 131 S. Ct. at 2851; *Zavala*, 2007-NMCA-149, ¶ 12.

**{10}**     In this case, R&C contends that it made a prima facie showing that New Mexico courts could exercise both general and specific jurisdiction over Joy Co. We address each of R&C's contentions in turn.

## 1.     General Jurisdiction

**{11}**     R&C maintains that it has met its prima facie burden of establishing general jurisdiction and that the district court erred in resolving the issue in Joy Co.'s favor. For the reasons that follow, we disagree.

**{12}**     A state exercises general jurisdiction over a nonresident defendant when its "affiliations with the [s]tate are so continuous and systematic as to render [it] essentially at home in the forum [s]tate." *Goodyear*, ___ U.S. at ___, 131 S. Ct. at 2851 (internal quotation marks and citation omitted). As a result, due process prohibits general jurisdiction over corporations when corporate ties arise from "the casual presence of the corporate agent or even his conduct of single or isolated" acts unrelated to the claim. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 317 (1945). The United States Supreme Court has explained that "[t]o require the corporation in such circumstances to defend the suit away from its home or other jurisdiction where it carries on more substantial activities has been thought to lay too great

5

and unreasonable a burden on the corporation to comport with due process." *Id.* In keeping with United States Supreme Court precedent, we too have said that general jurisdiction exists when a defendant can "reasonably foresee being haled into court in that state for any matter[.]" *Zavala*, 2007-NMCA-149, ¶ 12 (internal quotation marks and citation omitted).

**{13}** R&C contends that New Mexico has general personal jurisdiction over Joy Co. because the company has continuous and systematic contacts with New Mexico. However, R&C does not allege any facts to support this assertion. For example, R&C has not provided evidence that Joy Co. is incorporated under the laws of New Mexico, that it has corporate operations, employees, or agents here, or that it has manufacturing facilities in the state. Consequently, we conclude that the requisite types of contacts, such as the existence of corporate operations or the manufacture of products in New Mexico, which we have said can be a basis for general jurisdiction, do not exist over Joy Co. in this case. *Cf. United Nuclear Corp. v. Gen. Atomic Co.*, 90 N.M. 97, 102-03, 560 P.2d 161, 166-67 (1976) (holding that the combined facts showing the defendant's multiple activities within the state warranted the assertion of general jurisdiction).

**{14}** Moreover, to the extent that R&C asserts the sale of Joy Co.'s products in New Mexico may establish general personal jurisdiction, we are not persuaded. As the United States Supreme Court has recently clarified, the flow of a manufacturer's goods into the forum state alone does not create sufficient ties with that state to give it general jurisdiction over the manufacturer. *Goodyear*, ___ U.S. at ___, 131 S. Ct. at 2855. Consistent with the holding in *Goodyear*, we have previously determined that "mere purchases" of goods by customers in New Mexico, "even if occurring at regular intervals, are not enough to warrant a [s]tate's assertion of *in personam jurisdiction* over a nonresident corporation *in a cause of action not related to those purchase transactions.*" *Visarraga v. Gates Rubber Co.*, 104 N.M. 143, 147, 717 P.2d 596, 600 (Ct. App. 1986) (internal quotation marks and citation omitted). Applying the principles in *Goodyear* and *Visarraga*, we conclude that R&C's reliance on the facts showing that Joy Co.'s products are available to consumers in New Mexico—either incorporated into bicycles or through distributors serving the state—by itself, does not create such systematic and continuous contacts so as to require Joy Co. to submit to general jurisdiction in New Mexico. *Cf. Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448 (1952) (holding that there was general jurisdiction over a foreign corporation that maintained an office in Ohio and made corporate decisions from that office).

**{15}** The district court correctly determined that there were no facts demonstrating that Joy Co. has the requisite continuous and systematic contacts with New Mexico to confer general personal jurisdiction. However, that is not the end of our jurisdictional inquiry. We now consider whether the claim at issue arose out of Joy Co.'s purposeful contact with our state and, therefore, whether specific jurisdiction applies.

## 2. Specific Jurisdiction

**{16}** A state has specific jurisdiction over a nonresident defendant if that defendant's

6

contacts do not rise to the level of general jurisdiction, but the defendant nevertheless "purposefully established contact with New Mexico." *Zavala*, 2007-NMCA-149, ¶ 12 (alteration, internal quotation marks, and citation omitted). In other words, "there [must] be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." *Hiatt*, 117 N.M. at 464, 872 P.2d at 882 (internal quotation marks and citation omitted). The central feature of minimum contacts, then, is the requirement of purposeful availment. To determine "purposeful availment," we look at what activities the defendant directed toward New Mexico. *Zavala*, 2007-NMCA-149, ¶ 11.

**{17}** The United States Supreme Court has clarified that "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*, ___ U.S. at ___, 131 S. Ct. at 2851 (internal quotation marks and citation omitted); *see also Visarraga*, 104 N.M. at 146-47, 717 P.2d at 599-600 (recognizing that for New Mexico to assert specific jurisdiction over a nonresident defendant, the plaintiff's claim must "lie[] in the wake" of the defendant's commercial activities in New Mexico (internal quotation marks and citation omitted)). Thus, the flow of a manufacturer's products into the forum state through the stream of commerce may provide specific jurisdiction over a nonresident corporation. *Goodyear*, ___ U.S. at ___, 131 S. Ct. at 2855. Whether or not personal jurisdiction exists over a particular defendant is decided on a case-by-case basis. *See Gray v. Am. Radiator & Standard Sanitary Corp.*, 176 N.E.2d 761, 765 (Ill. 1961) ("The question cannot be answered by applying a mechanical formula or rule of thumb but by ascertaining what is fair and reasonable [under] the circumstances."), *abrogated on other grounds as recognized by Telular Corp. v. Mentor Graphics Corp.*, 282 F. Supp. 2d 869 (N.D. Ill. 2003).

**{18}** R&C argues that Joy Co. is subject to specific jurisdiction in New Mexico because it has purposefully availed itself of the protections and benefits of New Mexico law under the stream of commerce theory. In particular, R&C contends that Joy Co. established sufficient minimum contacts with New Mexico by placing the quick-release mechanism into the stream of commerce with the intent to distribute the product worldwide, including the United States.

**{19}** We begin with the appropriate due process standard for determining personal jurisdiction on a stream of commerce theory. The United States Supreme Court has noted that "[t]he stream-of-commerce metaphor has been invoked frequently in lower court decisions permitting jurisdiction in products liability cases in which the product has traveled through an extensive chain of distribution before reaching the ultimate consumer." *Goodyear*, ___ U.S. at ___, 131 S. Ct. at 2854-55 (internal quotation marks and citation omitted). While true, the Court's most recent cases have provided no clear guidance regarding the scope and application of the theory, leaving little uniformity among the many different federal and state courts decisions. It is not surprising then, that in this case the parties and the district court each cited to a different United States Supreme Court opinion as *the* controlling decision for its argument and decision. R&C relied on *World-Wide*

7

*Volkswagen*, while Joy Co. turned to Justice Kennedy's plurality opinion in *J. McIntyre Machinery*. The district court on the other hand relied on the stream of commerce theory set forth in Justice O'Connor's plurality opinion in *Asahi* to find that personal jurisdiction did not exist over Joy Co. Because the United States Supreme Court's splintered view of minimum contacts in *Asahi* and *J. McIntyre Machinery* provide no clear rule on this issue and because the plurality opinions in those cases are not the precedential holdings of the Court, a defendant's contacts with New Mexico continue to be evaluated by the stream of commerce standard as described in *World-Wide Volkswagen*. We later explain in detail why we do not follow any of the rationales in *Asahi* or *J. McIntyre Machinery*.

**a.** *World-Wide Volkswagen* **and New Mexico Law**

**{20}** The stream of commerce theory finds its origins in the United States Supreme Court decision in *World-Wide Volkswagen*. In *World-Wide Volkswagen*, the Court held that an Oklahoma court could not, consistent with the Due Process Clause, exercise jurisdiction over a nonresident automobile retailer and distributor "when the defendants' only connection with Oklahoma is the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma." 444 U.S. at 287. The Court reasoned that foreseeability that a product could cause injury in a state alone is insufficient to confer personal jurisdiction. *Id.* at 295-96. However, the Court explained that personal jurisdiction may exist over a nonresident defendant that "delivers its products into the stream of commerce with the *expectation* that they will be purchased by consumers *in the forum* [s]*tate*." *Id.* at 297-98 (emphasis added). Consequently, "if the sale of a product of a manufacturer . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other [s]tates, it is not unreasonable to subject it to suit in one of those [s]tates if its allegedly defective merchandise" injures someone there. *Id.* at 297.

**{21}** Our appellate courts have not had occasion to construe the stream of commerce theory in a products liability case since the United States Supreme Court decided *Asahi* in 1987. However, we have decided several cases prior to the issuance of that opinion that illuminate the requirements for minimum contacts sufficient to establish personal jurisdiction in New Mexico courts. We recognize that none of our case law is directly on point; however, we believe that these cases can be useful and are consistent with the stream of commerce analysis set forth in *World-Wide Volkswagen*.

**{22}** In *Visarraga*, we held that New Mexico courts could not assert jurisdiction over defendant Littlejohn's Equipment Company, Inc. (Littlejohn), the secondary distributor of a defective hose. 104 N.M. at 149, 717 P.2d at 602. The plaintiffs in that case sued the defendant after a tank truck making a delivery of gasoline to their gas station exploded and caught on fire. *Id.* at 144, 717 P.2d at 597. Littlejohn, a Colorado corporation, had purchased the hose from another Colorado corporation and then sold the hose to yet another company who installed the hose and sold the tank truck to Robinson Oil Company in New Mexico. *Id.* at 145, 717 P.2d at 598. In analyzing the jurisdictional issue, we relied on

*World-Wide Volkswagen* and its progeny to determine whether Littlejohn satisfied the constitutional due process requirements of purposeful availment. *Visarraga*, 104 N.M. at 148-49, 717 P.2d at 601-02. We first noted the distinction between manufacturers and primary distributors who avail themselves of broad markets with known benefits and secondary distributors and local retailers whose contacts with the forum state is more attenuated. *Id.* at 149, 717 P.2d at 602. Because Littlejohn's contact with New Mexico was "minimal and random in nature" and because it did not purposefully cause the hose at issue to be shipped into New Mexico, we ultimately held that the plaintiff failed to establish that Littlejohn had sufficient minimum contacts with New Mexico to subject it to personal jurisdiction. *Id.*

**{23}** In *Roberts*, the plaintiff's estate sued three defendants after a plane crash that killed the decedent. 100 N.M. at 365, 670 P.2d at 976. None of the defendants were located in New Mexico, and the question we had to answer was whether personal jurisdiction could be exercised over any of them. *Id.* at 365-66, 670 P.2d at 976-77. Although we concluded that jurisdiction did not exist over two of the defendants, we held that Custom Airmotive (Airmotive), an aviation repair shop located in Oklahoma, had the necessary minimum contacts with New Mexico to subject it personal jurisdiction here. *Id.* at 367-68, 670 P.2d at 978-79. Specifically, the record established that Airmotive had advertised in national trade journals to solicit business, performed work for New Mexico residents, and purposefully availed itself of the benefits and protections of New Mexico law because it would have the right to sue a customer in our courts for failure to pay. *Id.* Citing *World-Wide Volkswagen*, we said that Airmotive thus "should reasonably anticipate being haled into court here." *Roberts*, 100 N.M. at 367-68, 670 P.2d at 978-79 (internal quotation marks and citation omitted).

**{24}** Our lone Supreme Court opinion dealing with the notion of minimum contacts was decided well before the United States Supreme Court's decision in *World-Wide Volkswagen*. However, in *Blount v. T D Publishing Corp.*, 77 N.M. 384, 423 P.2d 421 (1966), our Supreme Court relied on that same line of cases that eventually became the basis of the *World-Wide Volkswagen* decision. In *Blount*, the plaintiffs brought suit against the defendants alleging invasion of privacy. 77 N.M. at 386, 423 P.2d at 422. The New York publisher in that case sold its magazines to a New York distributor who in turn re-sold the magazines to a New Mexico wholesaler who distributed the products in the state. *Id.* at 386-87, 423 P.2d at 423. The New Mexico Supreme Court recognized that in order to assert personal jurisdiction over the New York publisher, there had to be some act by which the publisher "purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate." *Id.* at 391, 423 P.2d at 426 (internal quotation marks and citation omitted). The Court held that the jurisdictional act demonstrating purposeful availment was not the creating of a defect but the nationwide distribution of defective products. *Id.* at 390, 423 P.2d at 425. Articulating a liberal approach to purposeful availment, our Supreme Court reasoned that

[w]hen a manufacturer voluntarily chooses to sell his product in a way which

9

will be resold from dealer to dealer, transferred from hand to hand and transported from state to state, he cannot reasonably claim that he is surprised at being held to answer in any state for the damage the product causes.

*Id.* Thus, the regular distribution plan and the commercial benefit to the nonresident defendant, which it derived from the sale of its products, was sufficient to satisfy due process and subject the defendant to our courts. *Id.* at 391, 423 P.2d at 426; *see also Asahi*, 480 U.S. at 117 (Brennan, J., concurring) ("A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum [s]tate, and indirectly benefits from the [s]tate's laws that regulate and facilitate commercial activity."); *Gray*, 176 N.E.2d at 764, 766-67 (holding that personal jurisdiction existed over a manufacturer of a component part manufactured in Ohio, incorporated into a product in Pennsylvania, that was ultimately sold in Illinois where it caused injury because, though the manufacturer did no business in Illinois, it could expect its product would be sold there and benefitted from the sale in the state); *Soria v. Chrysler Canada, Inc.*, 958 N.E.2d 285, 296-97 (Ill. App. Ct. 2011) (continuing to rely on *Gray* for the distribution-channel rationale).

**{25}** Both *World-Wide Volkswagen* and our New Mexico cases make clear that the mere foreseeability that a product may make its way into our state either by the act of a consumer or through a random or isolated sale is not enough to confer jurisdiction. Rather, there must be some act purposefully directed at the forum state. Thus, "the foreseeability that is critical to due process analysis is . . . that the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297.

**{26}** Reaffirming a preference for Justice Brennan's stream of commerce approach from *World-Wide Volkswagen*, we now turn to the facts in this case to determine whether R&C has made a prima facie case establishing that New Mexico may assert specific jurisdiction over Joy Co. under the stream of commerce theory of minimum contacts.

**b.** **Joy Co.'s Contacts With New Mexico**

**{27}** R&C contends that the presence of the quick-release mechanisms on bicycles sold within New Mexico through the direct sales of such mechanisms to bicycle sellers in the United States is sufficient to establish that Joy Co. has sufficient minimum contacts under *World-Wide Volkswagen* to subject it to jurisdiction in New Mexico. Based on the undisputed facts in this case, we agree.

**{28}** Joy Co. is a foreign corporation that has its principal places of business in Taiwan and China and operates under the laws of the Republic of China; Joy Co. designs bicycle component parts, including quick-release mechanisms and manufactures them at facilities in the Republic of China; and Joy Co. sells its products internationally to bicycle manufactures through a network of agents and suppliers, including J&B Importers, Inc. (J&B). J&B, which is headquartered in Miami, Florida, is a distributor of bicycle parts in

10

the United States, and it serves the New Mexico market from its Denver, Colorado facility. R&C can order the component parts manufactured by Joy Co. by purchasing them from J&B. In addition, Joy Co.'s full-time marketing and sales employee who is located in California sells Joy Co. products as well as provides customer service and support to Joy Co.'s clients throughout the United States, including New Mexico.

**{29}** Many bicycles sold by R&C have the Joy Co. quick-release mechanisms installed in them, and Joy Co. knows that the bicycles bearing their quick-release mechanism are sold worldwide. There is no dispute that Joy Co. manufactured the quick-release mechanism that was incorporated into Sproul's bike and that R&C sold Sproul the GT bike with the Joy Co. quick-release mechanism at issue in 1988. In fact, at that time, many GT bikes had Joy Co. quick-release mechanisms, including bicycles sold at New Mexico retailers such as K-Mart.

**{30}** Further, to the extent Joy Co.'s quick release mechanisms are sold in the United States, its manufacturing processes for the production of the item comply with the United States safety standards, and Joy Co. has "never tried not to comply" with the United States standard. Joy Co. does not avoid or prohibit the sale of its products in the United States, although it does specifically avoid selling its products in Central and South America.

**{31}** Based on the above facts, Joy Co. manufactured the allegedly defective product and placed it into the stream of commerce. The quick-release mechanism was eventually sold to R&C, a New Mexico retailer, which then allegedly caused the injury to Sproul. We conclude that the manufacture and marketing by Joy Co., J&B, and now its California employee, as well as the ultimate sale, reflect more than a mere expectation that the product *might* be purchased by a resident in this forum. Rather, the quick-release mechanism that was incorporated into Sproul's bicycle came to be in New Mexico due to the efforts of the "manufacturer or distributor to serve directly or indirectly" the market here. *See World-Wide Volkswagen*, 444 U.S. at 297. We believe that such directed efforts to the United States market reflect a purposeful intent to reach a consumer such as Sproul. Unlike the facts in *World-Wide Volkswagen* or *Visarraga*, this is not a situation involving a casual or accidental contact, and it is one that is directly related to the asserted cause of action in this case.

**{32}** Joy Co.'s principal argument on appeal is that the district court correctly found that New Mexico could not exercise jurisdiction over it because it has never directed its activities specifically toward New Mexico, nor did it have any direct contact with the state or knowledge that its products would be incorporated into bikes specifically sold in New Mexico. We disagree. As an initial matter, we note that Joy Co. does not assess the question here against the standard set forth in *World-Wide Volkswagen*, opting instead to focus solely on *Asahi* and *J. McIntyre Machinery*. In any event, neither *World-Wide Volkswagen* nor our cases require that a manufacturer direct activities specifically at the forum state. Rather, *World-Wide Volkswagen* requires that the defendant place the product into the stream of commerce with the *expectation* that it will be purchased by users in the forum state. 444 U.S. at 297-98. It is in the very nature of the stream of commerce theory of minimum contacts that a product will reach the forum state after a manufacturer has sold it in such a

11

way that it has passed from distributor to distributor to arrive there. *Goodyear*, ___ U.S. at ___, 131 S. Ct. at 2855; *Blount*, 77 N.M. at 390, 423 P.2d at 425. To insulate a foreign manufacturer of an allegedly defective component part that has caused injury in our state, unless it specifically targeted New Mexico or knew that its product will ultimately be resold here, defies logic. *See A. Uberti & C. v. Leonardo*, 892 P.2d 1354, 1362-63 (Ariz. 1995) (in banc) (stating that "a foreign manufacturer that knowingly and intentionally distributes its products in America through an American company [cannot] avoid jurisdiction of American courts by the simple expedient of closing its eyes and making no effort to learn about or restrict its distributor's activities"). Accordingly, we conclude that a manufacturer of an allegedly defective component part that has otherwise placed it into a distribution channel with the expectation it will be sold in our national market cannot be insulated from liability simply because it does not specifically target or know its products are being marketed in New Mexico. *See Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081, 1082-83 (5th Cir. 1984) (holding that personal jurisdiction existed over the manufacturer of a component part where it did not originate or control the distribution system of its product but did not seek to limit the states in which it would be used or sold); *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1127 (7th Cir. 1983) (holding that it was reasonable to assert personal jurisdiction over a foreign manufacturer when they knew their product would be sold by a distributor throughout the United States).

**{33}** Joy Co. cites much authority from other jurisdictions requiring that a defendant take additional acts directed at the forum state or have actual knowledge that its products are marketed there. *See Windsor v. Spinner Indus. Co.*, 825 F. Supp. 2d 632, 639-40 (D. Md. 2011) (finding no personal jurisdiction over the defendant because the Fourth Circuit requires forum-specific activity); *Dickie v. Cannondale Corp.*, 905 N.E.2d 888, 892-93 (Ill. App. Ct. 2009) (finding no personal jurisdiction over a foreign bicycle pedal manufacturer that sold its products to a distributor and knew its parts were sold in the United States because it had no downstream control); *Morris v. Halsey Enters. Co.*, 882 N.E.2d 1079, 1083-84 (Ill. App. Ct. 2008) (finding no personal jurisdiction over a foreign ceiling fan manufacturer that sold its products to a distributor and knew the products would be sold to large retailers throughout the United States but did not specifically know they would be sold in Illinois). Joy Co.'s reliance on these cases is misplaced as they were all decided by applying the multiple *Asahi* opinions. Because the different standard set forth in *World-Wide Volkswagen* continues to be applied, we do not discuss those cases here.

**{34}** Sufficient facts exist in this case to determine that Joy Co. purposefully directed its activities toward the United States market and, as a result, toward the New Mexico market as well. R&C has made a prima facie case establishing that Joy Co. has sufficient minimum contacts with New Mexico through its distribution system to subject it to personal jurisdiction in our courts. We next analyze whether it would be reasonable to assert specific personal jurisdiction over Joy Co.

**c.     Traditional Notions of Fair Play and Substantial Justice**

12

**{35}** Having established that Joy Co. has delivered its product into the stream of commerce, we now turn to the issue of reasonableness. The United States Supreme Court has held that even if a defendant has established sufficient minimum contacts with the forum state, the Due Process Clause forbids the assertion of personal jurisdiction over that defendant "under circumstances that would offend traditional notions of fair play and substantial justice." *Asahi*, 480 U.S. at 113 (internal quotation marks and citation omitted). To determine whether it is reasonable to exercise personal jurisdiction in each case, we consider five factors. *Id.*; *Zavala*, 2007-NMCA-149, ¶ 12. We balance the burden on the defendant, New Mexico's interest, the plaintiff's interest in obtaining relief, the interest in the efficient resolution of controversies, and the interest in promoting public policy. *Asahi*, 480 U.S. at 113; *Zavala*, 2007-NMCA-149, ¶ 12.

**{36}** Joy Co. advances only one argument on appeal: that it would be unduly burdened by being forced to defend this action in a foreign legal system. However, Joy Co. fails to provide any facts to support their argument that defending this case in New Mexico would be unduly burdensome except to say that is so. We recognize that there may be circumstances in which it would be unreasonable to require a foreign defendant whose only connection with the forum state is through the stream of commerce to defend itself in New Mexico courts. However, unlike the hypothetical defendants in Justice Breyer's *J. McIntyre Machinery* concurrence, Joy Co. is not a small farmer or cottage industry potter in a faraway country or state. *See J. McIntyre Mach.*, ___ U.S. at ___, 131 S. Ct. at 2794 (Breyer, J., specially concurring). Nor is Joy Co. like the Japanese manufacturer of component parts in *Asahi* whose only connection with the United States was that its component parts were incorporated into another product abroad and then sold throughout the United States. 480 U.S. at 112-13. Joy Co. is an international manufacturer with recent annual revenues between thirty-seven and forty-six million dollars. It currently does business directly with six United States bicycle manufacturers, and since 2009, has had an employee located in California. In 2009 and 2010, Joy Co. attended a trade show in Nevada. And since 2006 and 2008 respectively, Joy Co. has held two United States patents. These facts demonstrate that Joy Co. currently conducts activities that open it to litigation in the United States and through which it avails itself of our laws. In order to defend its patents or enter contracts with its United States clients, Joy Co. necessarily employs the legal system of particular states and of the United States. Although we acknowledge defending a suit in New Mexico would impose some burden on any nonresident, based on Joy Co.'s current activities in the United States, we conclude that burden on it is slight.

**{37}** In contrast, R&C contends that its interest in indemnification against Joy Co. is great. R&C also argues that New Mexico has a clear interest in resolving claims arising from injuries occurring here as the result of defective products sold or supplied by foreign manufacturers that profit from the sale of their product to New Mexico consumers. We agree. R&C's interest in obtaining relief is manifest, and its assertions are consistent with the policies embodied in our long-arm statute. Joy Co. manufactured the quick-release mechanism at issue, and it is thus the party ultimately responsible for the allegedly defective product. Because the burden of defending in the foreign legal system is slight in comparison

13

to R&C's and New Mexico's interest, the district court erred in finding that it is unreasonable to assert personal jurisdiction over Joy Co.

### d.      Declining to Apply *Asahi* or *J. McIntyre Machinery*

**{38}**    As we have noted, the district court in this case relied on *Asahi* in finding that it could not exercise specific personal jurisdiction over Joy Co. The district court acknowledged the "split view of the 'stream of commerce doctrine'" from that of *World-Wide Volkswagen* but nevertheless adopted the stream of commerce plus test set forth in *Asahi*. Joy Co. on the other hand relies on the United States Supreme Court's recent decision in *J. McIntyre Machinery* in which a plurality of the Court rejected the "national stream of commerce" theory as a basis for personal jurisdiction. We discuss the Court's multiple rationales in these cases and explain why the stream of commerce theories in either *Asahi* or *J. McIntyre Machinery* are not adopted here.

**{39}**    In *Asahi*, the United States Supreme Court issued a fractured decision outlining competing versions of the stream of commerce theory. 480 U.S. 102. The case arose out of a motorcycle accident, and the motorcycle rider filed suit against Cheng Shin Rubber Industrial Co., Ltd. (Cheng Shin), the Taiwanese manufacturer of the motorcycle tube. *Id.* at 105-06. Cheng Shin filed a cross-complaint against Asahi Metal Industry Co. (Asahi), the manufacturer of the tube's valve assembly. *Id.* at 106. The plaintiff's claim settled, and only Cheng Shin's complaint against Asahi remained. *Id.* Although the Justices unanimously held that exercising jurisdiction over Asahi would "offend traditional notions of fair play and substantial justice," they disagreed on whether Asahi has sufficient minimum contacts with the forum. *Id.* at 113-14, 116, 121 (internal quotation marks and citation omitted). Justice O'Connor, writing for a four-Justice plurality, asserted that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum [s]tate." *Id.* at 112. Instead, there must be "*an action of the defendant purposefully directed toward the forum [s]tate.*" *Id.* Justice O'Connor then explained,

> Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum [s]tate, for example, designing the product for the market in the forum [s]tate, advertising in the forum [s]tate, establishing channels for providing regular advice to customers in the forum [s]tate, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum [s]tate. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum [s]tate does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum [s]tate.

*Id.* Applying this reasoning to Asahi, Justice O'Connor concluded that exercising personal jurisdiction over the company would violate due process because there was no evidence of any action by Asahi to purposefully avail itself of the California market. *Id.* at 112-13.

**{40}**     Justice Brennan, writing for another four-Justice plurality, saw "no need" for a showing of additional conduct directed toward the forum when the defendant is aware that the stream of commerce may or will "sweep the product into the forum [s]tate." *Id.* at 116-17 (Brennan, J., concurring) (internal quotation marks and citation omitted). Instead, Justice Brennan viewed the stream of commerce as "the regular and anticipated flow of products from manufacture to distribution to retail sale" rather than as simply "unpredictable currents or eddies." *Id.* at 117 (Brennan, J., concurring). Accordingly, the facts in *Asahi* were sufficient to establish minimum contacts because Asahi was "aware of the distribution system's operation, and it knew that it would benefit economically from the sale in California of products incorporating its components." *Id.* at 121 (Brennan, J., concurring) (internal quotation marks and citation omitted). Justice Stevens, writing separately and joined by Justices White and Blackmun, first stated that the examination of minimum contacts was unnecessary in light of the Court's determination that exercise of jurisdiction over Asahi would be unreasonable and unfair. *Id.* at 121 (Stevens, J., concurring). In concluding that the minimum contacts part of the test had been satisfied, Justice Stevens criticized the plurality for assuming that a clear line can be drawn between awareness that a part will reach the forum state and purposeful availment of the forum market. *Id.* at 122 (Stevens, J., concurring). According to Justice Stevens, whether or not Asahi's conduct constituted purposeful availment required an examination of the volume, value, and hazardous character of the products. *Id.* (Stevens, J., concurring). Given the facts considered necessary by Justice Stevens, the *Asahi* opinion arguably supports a finding that there were sufficient minimum contacts based on the stream of commerce theory. However, the dueling *Asahi* opinions have done little more than provide a muddled rubric for deciding stream of commerce cases involving nonresident corporations and nowhere has that been more evident than in lower court decisions. For example, some federal and state courts have applied Justice Brennan's more broad stream of commerce approach. *See, e.g.*, *State v. NV Sumatra Tobacco Trading, Co.*, 666 S.E.2d 218, 223 (S.C. 2008) (finding personal jurisdiction under broad stream of commerce theory where the defendant's "actions indicate that it purposely availed itself of conducting business in all 50 states, including South Carolina"); *Kopke v. A. Hartrodt S.R.L.*, 629 N.W.2d 662, 674 (Wis. 2001) ("We believe the stream of commerce theory as set forth by Justice Brennan is the correct analysis to apply to the case at hand."). Others have opted for Justice O'Connor's stream of commerce plus test. *See, e.g.*, *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 479-80 (6th Cir. 2003) (expressing "preference" for Justice O'Connor's approach and applying it to the case); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 944-46 (4th Cir. 1994) (taking approach similar to that of Justice O'Connor). Still others choose to apply both *Asahi* approaches. *See, e.g.*, *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 205-07 (3d Cir. 1998) (taking approaches articulated by both Justices O'Connor and Brennan); *Wiles v. Morita Iron Works Co.*, 530 N.E.2d 1382, 1389 (Ill. 1988) (noting that "[u]nder either interpretation of the stream of commerce theory, it is clear that purposeful availment of the forum's market requires, at a minimum, that the alien defendant is aware that the final product is being marketed in the forum [s]tate." (emphasis, internal quotation marks, and citation omitted)). And, finally, some courts decline to follow either approach and continue to follow *World-Wide Volkswagen. See, e.g.*, *Irving v. Owens-Corning Fiberglas Corp.*, 864

F.2d 383, 386 (5th Cir. 1989) ("Because the Court's splintered view of minimum contacts in *Asahi* provides no clear guidance on this issue, we continue to gauge [the defendant's] contacts with Texas by the stream of commerce standard as described in *World-Wide Volkswagen* and embraced in this circuit."). In the most recent case before it, the expectation that the United States Supreme Court would articulate a clear rule and workable standard in stream of commerce cases did not materialize, and the issue continues to remain unclear. We explain.

**{41}** After a twenty-four year hiatus, the United States Supreme Court returned to the stream of commerce theory last year in *J. McIntyre Machinery*, ___ U.S. at ___, 131 S. Ct. at 2783. J. McIntyre Machinery, Ltd. (McIntyre) is an English corporation that contracted with an independent United States company to sell its machines in the United States. *Id.* at ___, 131 S. Ct. at 2786. Although it appears that four machines ended up in New Jersey, the Court noted that the record suggests only one machine ended up there. *Id.* Robert Nicastro filed suit in New Jersey state court after he injured his hand while using one of McIntyre's machines. *Id.* The United States Supreme Court reversed the New Jersey Supreme Court, which held that due process permitted the exercise jurisdiction over McIntyre. *Id.* at ___, 131 S. Ct. at 2785. Justice Kennedy, writing for Chief Justice Roberts and Justices Scalia and Thomas, explained that when a defendant places its goods in the stream of commerce and they are sold to a person in the forum state, "[t]he principal inquiry . . . is whether the defendant's activities manifest an intention to submit to the power of a sovereign." *Id.* at ___, 131 S. Ct. at 2788. In other words, "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum [s]tate." *Id.* Under this theory, therefore, a defendant who targets the United States market as a whole but not the market of any particular state can avoid being subject to jurisdiction in any state for actions arising under state law. Applying this principle, Justice Kennedy recognized that although McIntyre directed marketing and sales at the United States market, it did not purposefully avail itself of the New Jersey market. *Id.* at ___, 131 S. Ct. at 2790. Consequently, the Court concluded that exercise of personal jurisdiction would violate due process. *Id.* at ___, 131 S. Ct. at 2791.

**{42}** Justices Breyer and Alito concurred in the judgment but for different reasons. Justice Breyer noted that none of the Court's precedents found that a single, isolated sale of a good in the forum state was constitutionally sufficient to confer personal jurisdiction. *Id.* at ___, 131 S. Ct. at 2792 (Breyer, J., concurring). In this instance, there was no regular course of sales to New Jersey, precluding a finding of jurisdiction even under Justice Brennan's stream of commerce theory. *Id.* (Breyer, J., concurring). Therefore, Justice Breyer concluded that the case could be decided based on precedent and without "making broad pronouncements that refashion basic jurisdictional rules." *Id.* at ___, 131 S. Ct. at 2792-93 (Breyer, J., concurring).

**{43}** Justices Ginsburg, Sotomayor, and Kagan dissented, taking a more expansive approach to the due process requirements for the exercise of personal jurisdiction. Justice

16

Ginsburg first criticized the plurality, stating that, "the plurality's notion that consent is the animating concept draws no support from controlling decisions of this Court." *Id.* at ___, 131 S. Ct. at 2799 (Ginsburg, J., dissenting). Instead, "[t]he modern approach to jurisdiction over corporations and other legal entities, ushered in by *International Shoe*, gave prime place to reason and fairness." *J. McIntyre Mach.*, ___ U.S. at ___, 131 S. Ct. at 2800 (Ginsburg, J., dissenting). Here, McIntyre availed itself of the United States market nationwide, "not a market in a single [s]tate or a discrete collection of [s]tates." *See id.* at ___, 131 S. Ct. at 2801 (Ginsburg, J., dissenting). Justice Ginsburg further explained that this suit was distinguishable from *Asahi*, because Asahi, unlike McIntyre, did not seek out customers in the United States or engage distributors to promote its products in the United States. *J. McIntyre Mach.*, ___ U.S. at ___, 131 S. Ct. at 2803 (Ginsburg, J., dissenting). In addition, Asahi manufactured component parts "with little control over the final destination of its products"; McIntyre, in contrast, sold finished products. *Id.* (Ginsburg, J., dissenting) (internal quotation marks and citation omitted). Consequently, Justice Ginsburg "would hold McIntyre UK answerable in New Jersey for the harm Nicastro suffered at his workplace in that [s]tate using McIntyre UK's shearing machine." *Id.* at ___, 131 S. Ct. at 2804 (Ginsburg, J., dissenting).

**{44}**    Because *J. McIntyre Machinery* did not produce a majority opinion adopting either Justice O'Connor's or Justice Brennan's stream of commerce theory, and given Justice Breyer's reliance on current United States Supreme Court precedent, pre-*Asahi* case law utilizing the approach set forth in *World-Wide Volkswagen* remains binding in New Mexico. This approach requires us simply to adhere to our precedents, at least until the United States Supreme Court resolves the twenty-five-year-old uncertainty over whether stream of commerce theory is sufficient to establish the required minimum contacts and, if so, how it should be applied. For these reasons, the district court decision applying Justice O'Connor's stream of commerce plus approach from *Asahi* was in error. Joy Co.'s view that the proper approach to applying the minimum contacts test is to follow Justice Kennedy's plurality opinion in *J. McIntyre Machinery* is also rejected.

## IV.    CONCLUSION

**{45}**    Viewing the facts in a light most favorable to R&C, Joy Co.'s conduct and activities directed at the forum state are sufficient to establish a prima facie showing that personal jurisdiction is proper under the New Mexico long-arm statute and consistent with the requirements of federal due process. We reverse the district court's decision and remand for further proceedings.

**{46}    IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**RODERICK T. KENNEDY, Judge (dissenting).**

17

**MICHAEL E. VIGIL, Judge (specially concurring).**

**VIGIL, Judge (specially concurring).**

**{47}** I agree that Joy Co.'s conduct and activities are sufficient to confer specific jurisdiction on the New Mexico district court to decide R&C's claim for indemnification against Joy Co. In my opinion, however, this case does not require us to "reject" or "adopt" any views expressed by the United States Supreme Court. Accordingly, I specially concur.

**{48}** The question presented in this case is whether Joy Co. has purposefully availed itself of the privilege of conducting activities within New Mexico, thereby invoking the protection of its laws, and whether the claim for indemnification brought by R&C against Joy Co. arises out of Joy Co.'s activities in New Mexico. *See J. McIntyre Mach.*, ___ U.S. at ___, 131 S. Ct. at 2787-88. Two general views have emerged in the analysis of whether a non-resident is subject to the jurisdiction of a state court consistent with due process. Both views command agreement of four justices, while neither commands agreement of a majority. These are Justice Brennan's view, and Justice O'Connor's view, both of which are expressed in *Asahi*, which was decided by a plurality opinion.

**{49}** I refer to Justice Brennan's view as the "stream of commerce" view. Under this view:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State.

*Asahi*, 480 U.S. at 117 (Brennan J., concurring). Thus, if a defendant is aware, or could have foreseen, that its product would ultimately be sold in a state in the stream of commerce, it is subject to personal jurisdiction in that state. *Id.*

**{50}** I refer to Justice O'Connor's view as the "purposefully directed" test. Under this view:

> The 'substantial connection' between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action

18

of the defendant purposefully directed toward the forum State. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.

*Asahi*, 480 U.S. at 112 (emphasis, internal quotation marks, and citations omitted). This view rejects foreseeability as the standard and instead requires a defendant to take some deliberate and overt action to target the market in the forum state. *Id.*

**{51}** *J. McIntyre Machinery* is the most recent opinion of the United States Supreme Court addressing personal jurisdiction, and it was also decided by a plurality opinion. Speaking for four justices, Justice Kennedy states:

[P]ersonal jurisdiction requires a forum-by-forum, or sovereign-by sovereign, analysis. The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct.

___U.S. at ___, 131 S. Ct. at 2789.

**{52}** Judge Vanzi has fairly summarized the facts in ¶¶ 27-31; 36, and they do not need repeating here. Those facts clearly establish compliance with Justice Brennan's "stream of commerce" test. The facts also satisfy Justice O'Connor's "purposefully directed" test. Through its marketing and distributing scheme, Joy Co. clearly targeted New Mexico as a State in which contractual duties and obligations—the basis for the indemnity claim—would be undertaken. The fact that Joy Co. itself does not enter into New Mexico is not dispositive. Summarizing existing case law in *J. McIntyre Machinery*, Justice Kennedy states, "a defendant may in an appropriate case be subject to jurisdiction without entering the forum—itself an unexceptional proposition—as where manufacturers or distributors 'seek to serve' a given State's market." *Id.* at ___, 131 S. Ct. at 2788 (citations omitted). Specific, concrete examples set forth in Justice O'Connor's opinion which demonstrate an intent or purpose to serve the market in the forum state include, "establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi*, 480 U.S. at 112. Those conditions are plainly present in this case. Finally, I submit that the facts satisfy the view expressed in *J. McIntyre Machinery*. Specifically, the facts demonstrate that through its marketing and distributing scheme, Joy Co. has engaged in a course of conduct directed at the economy existing within New Mexico.

**{53}** For the foregoing reasons, I do not believe it is necessary to "decline" to apply *Asahi* or *J. McIntyre Machinery* as proposed by Judge Vanzi. However, since I believe that under our standard of review, the facts herein satisfy both *Asahi* and *J. McIntyre Machinery*, I specially concur in the result reached.

19

**KENNEDY, Judge (concurring in part and dissenting in part).**

**{54}**    I agree that there is no general jurisdiction to be exercised with regard to Joy Co. I respectfully disagree with the Majority that New Mexico has specific jurisdiction to entertain this indemnity claim. I believe the Opinion's liberal approach is excessively broad. Placing goods in the worldwide stream of commerce, together with a general awareness that products delivered to distributors elsewhere might land in New Mexico, should not suffice for "purposeful availment" of the benefits and protections of New Mexico's legal system. [Op. ¶ 24] I am not satisfied that such an approach possesses the degree of certainty and predictability to reliably establish a manufacturer's relationship with New Mexico as a foreign state.

**{55}**    I would use a test requiring behavior on Joy Co.'s part that was more demonstrably "*purposefully directed*" at New Mexico by Joy Co. and not just an artifact of Joy Co. being at the front end of a convoluted distribution chain that brought a bicycle part to our state. *See Asahi*, 480 U.S. at 112. The focus should be on Joy Co.'s actions in their business that are directed toward New Mexico, not a nebulous *post hoc* imputation of their expectations deriving from where their product might turn up. The Opinion's selective approach to specific jurisdiction adopts Justice Brennan's solo dissent in *World-Wide Volkswagen*, where his opinion loosed more limited and amorphous criteria for jurisdiction that "the litigation is connected to the forum, the defendant is linked to the forum, and the burden of defending is not unreasonable," 444 U.S. at 302. There, Justice Brennan rejected any consideration of how a distribution chain might operate to bring goods into the state, or whether goods arrived at the end of a long distribution chain over which no control might be exerted by the manufacturer. Rather, he opined that no more need be required of a defendant than "[i]n each case the seller purposefully injects the goods into the stream of commerce and those goods predictably are used in the forum [s]tate." *Id.*, 444 U.S. at 307.

**{56}**    The standard enunciated by Justice O'Connor in *Asahi* is one I believe to be very much alive and requires a showing that Joy Co. also "purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate" and, thereby, "invoke[ed] the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). This is not a products liability case against Joy Co. It is a claim by a bicycle store for indemnity from the maker of a bicycle component that may have failed in a fifteen- year-old bicycle. A court may exercise specific jurisdiction when (1) the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there, and (2) the controversy arises out of or is related to the defendant's contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). The arrival of Joy Co's bicycle part in New Mexico was an incidental contact with New Mexico and insufficiently purposeful to justify invoking our specific jurisdiction.

**{57}**    Last year, the United States Supreme Court once again visited this cratered battlefield of plurality jurisprudence and managed to forge an agreement between six justices as to two propositions that are applicable here. *J. Mcintyre Mach.*, ___ U.S. ___, 131 S. Ct. 2780. First, the stream of commerce notion alone, even to the extent that it is employed to paint a satisfying gloss of foreseeability on the arrival of a product within a particular jurisdiction, is not enough to sufficiently protect the due process right of Joy Co. "not to be coerced except by lawful judicial power." *Id.* at 2785.  This requires "some act" of Joy Co., by which it availed itself of the privilege of conducting activities within the forum state that invokes the benefits and protections of its laws. *See id.* at 2787.  A specific effort to sell in the forum state, purposeful availment of the privilege of doing business in the forum state and the expectation that one's goods will be purchased in the forum state constitute the points of agreement in which the plurality's opinion was joined by the two concurring justices, giving a six-justice majority to the inapplicability of mere stream of commerce and foreseeability as sufficient to confer special jurisdiction. *Id.* at 2792.

**{58}**    This is not the loose approach taken by the Opinion in this case that conflates foreseeability with expectation and then availment.  It also does not allow for the conflation of Joy Co. seeking to serve the United States market with purposeful intent to reach the New Mexico consumer.  [Op. ¶ 31]  Such a view of an intent to reach the consumer is not the test we should use, but rather we should look to purposeful intent to utilize the benefits and protections of the forum upon which the Opinion should focus.  It is specifically this relationship with the forum that requires the application of due process, and purposeful availment requires an act by Joy Co. "purposefully directed toward the forum [s]tate" and not merely an awareness or an intention born of using nationwide distribution networks. *Asahi*, 480 U.S. at 112.  In *Hanson*, that involved acting so as to gain the "privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws."  357 U.S. at 253.  In this case, Joy Co. has not purposefully pursued its contacts with New Mexico in a way that it might benefit from the protection of our laws, but rather the other way around.  A New Mexico entity seeks to use New Mexico law for its own benefit and protection.

**{59}**    Both the plurality and Justice Breyer's concurrence rejected the notion that a desire for an American distributor to sell its product to any willing customer in the United States, and participation in trade shows were facts that adequately supported finding minimum contacts between a manufacturer and a state. *J. McIntyre Mach.*, ___ U.S. at ___, 131 S. Ct. at 2790-91.  Joy Co. has no representatives in New Mexico, and none of its products reach our state save through a Denver distributor, or through the inclusion of its parts by bicycle manufacturers who avail themselves of downstream distributors.  R&C's manager never established that he has ever independently ordered a Joy Co. component through the Denver distributor for sale in New Mexico, and no direct sale from Joy Co.'s representative in California was documented.  [FOF 12, 20, RP 928, 929]  Justice Stevens' concurrence in *Asahi* evidenced no more than an inclination that the minimum contacts part of the test had been satisfied, but usefully outlined some circumstances echoed later in *J. McIntyre Machinery* that could be relevant to determining a company's contacts with the forum state,

including the volume of sales, the value of the goods, and the hazardous character of the components. *Asahi*, 480 U.S. at 122; *J. McIntyre Mach.*, ___ U.S. at ___, 131 S. Ct. at 2790, 2793. Here, the value and volume of sales seems minimal, and the items are not inherently dangerous so as to anticipate their causing injury.

**{60}** Viewing a worldwide pool of commercial transactions so as to confer upon every manufacturer a specific intention to do business within every jurisdiction, and moreover impute a corporate anticipation of being haled into the courts of New Mexico as a result is a siren's call I believe more sensible jurisprudence requires me to reject. The Majority and I do not agree that *Asahi* and later cases, such as *J. McIntyre Machinery*, owing to their multiple pluralities of opinion, have limited relevance to this situation. I believe that *World-Wide Volkswagen* has indeed evolved to provide a more sophisticated view of specific jurisdiction that would support affirming the district court in this case. With the frequent reliance placed on *Asahi* by the majority opinion to glean selected precepts, the broader view of development through *J. McIntyre Machinery* is one I find more satisfying to resolve the jurisdictional question posed by this case. Hence, I believe that Joy Co.'s connection with New Mexico is too attenuated to support specific jurisdiction, requiring some additional factor or act on Joy Co.'s part than simply having a marketable item in the "stream of commerce" and an imputed awareness that it would arrive in New Mexico is a better standard.

**{61}** I view Justice Breyer's concurrence in *J. McIntyre Machinery* as quite explicit in rejecting any jurisdiction based on no more than a producer being subject to jurisdiction "so long as it knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." ___ U.S. at ___, 131 S. Ct. at 2785. His precise reasoning was that, to adopt such a stream of commerce approach, would be to ignore "the relationship between the defendant, the *forum*, and the litigation." *Id.* at 2793. In a case such as this, where the distribution chain seems to begin with Joy Co.'s contacts outside of the United States and no direct line between Joy Co. and New Mexico exists, I would not take jurisdiction based on little more than their part showing up in a bicycle fifteen years ago.

**{62}** I respectfully dissent.

_____

**RODERICK T. KENNEDY, Judge**
